## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | 5:10-CR-1(1) |
| | § | |
| LEO PATRICK COLLINS | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Defendant's Motion to Suppress (Docket Entry # 33) was referred to the Honorable Caroline M. Craven for the purpose of preparing a report and recommendation. The Court, having reviewed the relevant briefing and hearing arguments of counsel June 14, 2010, recommends the motion should be **DENIED**.

### I. BACKGROUND

On December 7, 2009, Leo Patrick Collins ("Defendant") was stopped outside the city limits of Winfield, Texas for an alleged traffic offense by Sgt. Charlie Walker of the Winfield Police Department. A subsequent search of Defendant's vehicle resulted in the seizure of approximately 2 kilograms of cocaine and other items of personal property.

### II. DEFENDANT'S MOTION TO SUPPRESS

Defendant moves the court to suppress all evidence seized on December 7, 2009, in a search of Defendant's automobile on US Interstate Highway 30 in Titus County, Texas. According to Defendant, Sgt. Walker had no legal authorization to conduct a traffic stop outside his jurisdiction. Defendant further asserts the search in this case was conducted without a warrant in violation of the Fourth Amendment of the United States Constitution.

## III. THE JUNE 14, 2010 HEARING

Winfield, Texas Police Department Sgt. Charlie Walker ("Sgt. Walker") testified at the June 14, 2010 hearing that he has been a sergeant for over two years, and he had over two years experience prior to becoming a sergeant. He has had training in making drug interdiction stops, meaning making contact with people traveling on roadways who are engaged in carrying contraband. He has had approximately 1500-2000 hours of drug interdiction training with approximately 1000-1500 hours in the field. Sgt. Walker testified he has had extensive training in verbal clues and indicators that someone is involved in criminal activity, and he uses these techniques on a regular basis.

Sgt. Walker testified regarding the incident on December 7, 2009, wherein he stopped Defendant on Interstate 30 ("I-30") at approximately 11:30 p.m. Matt Brown, a firefighter for the Hopkins County Fire Department, was riding in the patrol car with Sgt. Walker on the date in question. According to Sgt. Walker, it is not unusual for a civilian to ride with an officer, observing the officer patrol. Mr. Brown had previously ridden with Sgt. Walker while on patrol.

On the date in question, Sgt. Walker was observing the traffic and observed a white vehicle pass by with a defective license plate light, obstructing the officer's view of the vehicle's license plate. Sgt. Walker flagged the vehicle for a traffic stop, taking in as much information about the vehicle as possible while he attempted to catch up to the vehicle.

According to the Government's written response to Defendant's motion, Sgt. Walker pulled into the righthand lane of traffic, caught up to the white Lexus being driven by Defendant, and confirmed that the license plate light was defective. Sgt. Walker testified he then activated his overhead emergency red and blue lights and signaled for the car to pull over on the improved

2

shoulder, automatically activating an audio and video dash camera in the patrol vehicle. Sgt. Walker's camera system records what is going on in front of the patrol car and inside of the patrol car at the same time. There are two microphone systems, one is worn by Sgt. Walker and one is located above the passenger's side door. According to Sgt. Walker, he was wearing the body microphone on the date in question.

Once the vehicle came to a stop, Sgt. Walker approached the passenger side of the vehicle. As he approached, Sgt. Walker noticed the vehicle was extremely clean and occupied by only the driver. As he approached, Sgt. Walker also noticed, and verbally commented to himself, the presence of an extremely strong odor of air freshener coming from the vehicle; this was before any window was opened. Once he reached the passenger's side of the vehicle, Sgt. Walker tapped on the passenger-side window so he could speak with the driver, Defendant Collins. Defendant acknowledged Sgt. Walker's presence. According to Sgt. Walker, Defendant appeared to be unfamiliar with the vehicle he was driving. Specifically, Defendant tried to roll the window down. but he was unable to figure out how to roll the window down. Defendant had to open the passenger-side door. When Defendant opened the passenger-side door, Sgt. Walker explained who he was and asked for his information. Defendant indicated that the vehicle belonged to his uncle who resides in Pine Bluff, Arkansas.

After Sgt. Walker asked Defendant to get his driver's license and proof of insurance, Defendant handed Sgt. Walker the information either in the car or as soon as he exited the vehicle. Sgt. Walker asked Defendant to follow him to the side of the road out of harm's way. Sgt. Walker frisked Defendant for weapons, as is his practice, and then asked Defendant to sit in the front passenger seat of his patrol car. Sgt. Walker then sat in the driver's side of the patrol car.

3

Once inside the patrol car, Sgt. Walker activated the camera inside the passenger area of the car.[1] According to Sgt. Walker, he was waiting for the return of information regarding Defendant's driver's license and insurance. Sgt. Walker testified Defendant was legally detained at this time.

Earlier on the night in question, Officer Jeff Mosley of the Royce City Police Department had contacted Sgt. Walker, indicating he was suspicious of two vehicles, one of which he had stopped. Officer Mosley described the red car he had stopped as the "chase car." Officer Mosley suspected the second vehicle, a white car with Arkansas license plates, might have drugs inside and that Sgt. Walker should be on the lookout for a white vehicle with Arkansas license plates. On cross-examination, Sgt. Walker testified he stopped Defendant's white vehicle because it had a defective license plate light which is a violation of Texas traffic laws. Sgt. Walker did not recall stopping any other white vehicles with Arkansas license plates on the night in question.[2]

In the patrol car, Sgt. Walker told Defendant that he pulled him over because he had a defective license plate light. Sgt. Walker asked Defendant how long Defendant had the car, and Defendant said for "a couple of days." Sgt. Walker turned off his headlights in order to show Defendant that the light was out over the rear license plate on the vehicle Defendant was driving. Sgt. Walker agreed with Defendant that Defendant should tell his uncle about the defective light. Sgt. Walker then inquired as to Defendant's trip to Texas, and Defendant stated he had been to Houston. Sgt. Walker commented that Defendant had driven about 100 miles out of the way.

---

[1] The Court viewed a copy of the recording at the hearing. The Government also introduced the recording as Exhibit 1.

[2] Defendant introduced as Exhibit 2 at the hearing the original DVD from Sgt. Walker's patrol car, asserting this recording would contain previous traffic stops from the date in question and would verify whether Sgt. Walker stopped any other white vehicles with Arkansas license plates on the night in question.

Defendant then said he had stopped by Dallas to see some friends. Defendant stated he had driven to these destinations from Arkansas all in one day, causing Sgt. Walker to comment that Defendant had been doing "a lot of driving." Sgt. Walker then asked if Defendant did not have to work that day, and Defendant responded that he had been laid off. While waiting for the driver's license check to be completed and after continued questions regarding Defendant's extensive travel, Sgt. Walker placed a call for assistance.[3] He then continued questioning Defendant regarding the times and dates of his travel. Defendant was struggling with his answers and then said "can you work with me?" Defendant then said "what's going on," and Sgt. Walker replied that they were just having a conversation.

Defendant then commented that Sgt. Walker had called for assistance. He then told Sgt. Walker that he was supposed to meet this guy, the "main one," on State Line in Texarkana and that Sgt. Walker should wait to call for assistance then, asking "you follow me?" Sgt. Walker asked "what are you talking about, Collins?" After Defendant acknowledged the other guy's car, Sgt. Walker told Defendant that he knew Defendant was being followed by another car, and the other car had been stopped. Defendant replied, "I know." Then Sgt. Walker stated, "And you're the one who's got the dope." Defendant paused and then stated, "It's not mine. I know what you are saying . . . ."

At that point, Sgt. Walker told Defendant to get out of the patrol car. After instructing Defendant to put his hands behind his back and inviting Mr. Brown to put the handcuffs on Defendant, Sgt. Walker told Defendant not "to do anything silly." Then, Sgt. Walker asked Defendant "how much you got in there?" Defendant told Sgt. Walker he did not know. Sgt. Walker

---

[3] After speaking with Defendant inside his patrol car, and relying on his training in drug interdiction, Sgt. Walker became convinced Defendant was in possession of drugs.

asked "it's in the trunk?" Defendant said "yes" and that "he was supposed to meet him [the guy in the red car] up here." Sgt. Walker briefly walked to the driver's side of the patrol car to check on his back-up, and when he returned, he said to Defendant, "didn't you tell me there is dope in the car?" Sgt. Walker then asked if he could search the vehicle. Defendant gave verbal consent. Sgt. Walker explained the situation to the back-up, and they searched the trunk of the car, locating 2 kilograms of cocaine. After Sgt. Walker located the narcotics, he read Defendant his *Miranda* rights. Sgt. Walker then observed the red car pass by on I-30.

Although the Government's response indicates Sgt. Walker arrested Defendant and read him his *Miranda* rights before asking for and receiving verbal consent to search, the DVD of the stop reveals that Sgt. Walker read Defendant his *Miranda* rights after receiving consent to search and locating the narcotics in the trunk of the car. Sgt. Walker left the narcotics in the vehicle because it is standard police procedure is to leave the drugs in the vehicle until the police can process the evidence. Mr. Brown, the firefighter who was riding with Sgt. Walker, drove the vehicle to the Mt. Pleasant police department. Based on his video monitoring, Sgt. Walker asserts the drugs never left his custody. According to Sgt. Walker, Mr. Brown was only operating the vehicle; Sgt. Walker was following him in the patrol car and recording him as well.

## IV. DISCUSSION

### A. Whether Sgt. Walker had legal authorization to conduct the traffic stop

Texas law allows a peace officer to arrest a person for a violation of the Transportation Code, "only if the offense is committed in the county or counties in which the municipality employing the peace officer is located." *Texas Code of Criminal Procedure*, Chapter 14, Article 14.03(g)(2). In his motion, Defendant asserts, in one sentence, that Sgt. Walker had no legal authorization to conduct

6

a traffic stop outside his jurisdiction. Sgt. Walker testified he stopped Defendant at the 160 mile marker on I-30 which is within Titus County and in the City of Mt. Pleasant.[4] Sgt. Walker is one of three officers employed by the City of Winfield which is also located within Titus County on I-30 between mile marker 154 to approximately mile marker 156. Sgt. Walker explained that the City of Winfield is positioned approximately one quarter of a mile from the Titus County/Franklin County line,[5] and he has extraterritorial jurisdiction that includes the first mile of Franklin County. It is undisputed, however, that the town of Winfield, Texas, where Sgt. Walker is employed, is within Titus County, and the 160 mile marker on I-30 is also in Titus County. Therefore, Sgt. Walker was within his jurisdiction when he made the stop.

**B.     Whether the traffic stop violated the Fourth Amendment**

Defendant further asserts the traffic stop violated the Fourth Amendment of the United States Constitution. According to Defendant, the search in the instant case does not fall within any exception to the warrant requirement because it was not a proper search incident to a lawful arrest; there was no probable cause to search the vehicle; and Sgt. Walker's actions during the stop were not reasonably related in scope to the circumstances which may have justified the interference in the first place.

The Fourth Amendment generally prohibits the government from executing a search or seizure without probable cause. *See United States v. Kye Soo Lee*, 898 F.2d 1034, 1039 (5th Cir.1990). If a warrantless search or seizure is conducted, the burden shifts to the government to

---

[4] According to Sgt. Walker, this is part of his routine patrol.

[5] One quarter of a mile west of Winfield on I-30, at the 153 mile marker, is the Franklin County line

7

justify the warrantless search. *See United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995). However, a search is permissible without probable cause if consent is obtained prior to the search.

A person may give consent to a search of his person, property, or vehicle. The Court should consider six factors when evaluating the voluntariness of consent: (1) the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *See United States v. Cooper*, 43 F.3d 140, 144 (5th Cir. 1995); *citing United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir.1983); *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir.1993). No one factor is dispositive in determining the voluntariness of consent. *See Cooper*, 43 F.3d at 144.

Here, after he was placed in custody, Defendant gave consent to Sgt. Walker to search the vehicle. Defendant has not suggested nor was there any evidence advanced that his consent was not voluntary. Even so, it is noted that Defendant was in custody when consent was given. There is no evidence of the presence of coercive police procedures being used, and Defendant cooperated with Sgt. Walker. In fact, while talking with Sgt. Walker about his travel plans and after hearing Sgt. Walker call for assistance, Defendant volunteered that he was meeting the "main" guy in Texarkana.

Although Sgt. Walker read Defendant his *Miranda* rights after asking for and receiving Defendant's consent to search, it is not required that an officer advise a suspect of their right to refuse consent to a search for the consent to be voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973). Even if a defendant was unaware of his right to refuse consent, an individual's subjective knowledge of the right is not a prerequisite to voluntary consent. *Id.* at 234. Here, although Sgt.

8

Walker did not explicitly tell Defendant he had the right to refuse consent to search the car, it did not negate the voluntariness of the consent given. Importantly, there is no evidence Defendant was unaware of his right to refuse consent. Finally, there is no evidence before the Court to indicate that Defendant lacks education or average intelligence or that Defendant believed that no incriminating evidence would be found. Defendant acknowledged there were drugs in the vehicle before he gave verbal consent to search the vehicle. Based on these factors, the Court finds Defendant's consent was voluntary.

However, even if the Court were to assume the consent given was not voluntary, the Court notes that the United States Supreme Court, in *Terry v. Ohio*, 392 U.S. 1 (1968), carved out an exception to the general rule requiring the existence of probable cause prior to a detention or search. In *Terry*, the Supreme Court stated that where there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime, limited searches and seizures are permissible under the Fourth Amendment even though probable cause does not exist. If the detaining officer is able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search or seizure]," then the intrusion is valid. *See Id.* at 22. In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court applied the principles of *Terry v. Ohio*, 392 U.S. 1 (1968) to automobile searches.

In this case, the initial traffic stop was valid because Sgt. Walker observed a vehicle with a defective license plate light in violation of the traffic laws of the State of Texas. Once Sgt. Walker stopped Defendant, he was entitled to conduct an investigation reasonably related in scope to the circumstances that initially justified it. Several circumstances during the stop entitled Sgt. Walker to detain Defendant until he had satisfied his suspicions. First, Sgt. Walker noted the strong odor of

air freshener emanating from the vehicle as well as Defendant's inability to lower the passenger-side window. Given Sgt. Walker's training in drug interdiction, Defendant's responses regarding the vehicle and the timing and extent of his travel plans, together with the circumstances surrounding the initial stop, gave rise to suspicions unrelated to the traffic offense. Sgt. Walker properly broadened his inquiry. The totality of the circumstances known to Sgt. Walker met the requisite level of reasonable suspicion under *Terry* to detain Defendant until he had satisfied his suspicions. Defendant's argument that the search violated the Fourth Amendment is without merit.

## V. RECOMMENDATION

Based on the foregoing, it is hereby

**RECOMMENDED** that Defendant's Motion to Suppress (Docket Entry # 33) be **DENIED.**

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 21st day of June, 2010.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE